Slip Op. 13-90

UNITED STATES COURT OF INTERNATIONAL TRADE

| | | |
|---|---|---|
| MARSAN GIDA SANAYI VE TICARET A.S., | : | |
| *Plaintiff,* | : | |
| v. | : | |
| UNITED STATES, | : | |
| *Defendant,* | : | Court No. 11-00431 |
| and | : | |
| AMERICAN ITALIAN PASTA COMPANY, | : | |
| DAKOTA GROWERS PASTA COMPANY, and | | |
| NEW WORLD PASTA COMPANY, | : | |
| *Defendant-Intervenors.* | : | |

[Denying Plaintiff's Motion for Judgment on the Agency Record]

Dated:  July 19, 2013

    David L. Simon, Law Offices of David L. Simon, of Washington, D.C., argued for Plaintiff.

    Tara K. Hogan, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, D.C., argued for Defendant.  With her on the brief were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Claudia Burke, Assistant Director. Of counsel on the brief was Daniel J. Calhoun, Office of the Chief Counsel for Import Administration, U.S. Department of Commerce, of Washington, D.C.

    Paul C. Rosenthal, Kelley Drye & Warren, LLP, of Washington, D.C., argued for Defendant-Intervenors.  With him on the brief was David C. Smith.

# OPINION

RIDGWAY, Judge:

In this action, Plaintiff Marsan Gida Sanayi ve Ticaret A.S. ("Marsan") – a Turkish exporter of pasta – contests the final results issued by the U.S. Department of Commerce in the 14th antidumping duty review of certain pasta from Turkey. *See Certain Pasta from Turkey: Notice of Final Results of 14th Antidumping Duty Administrative Review*, 76 Fed. Reg. 68,399 (Dep't Commerce Nov. 4, 2011) ("Final Results"); *Certain Pasta from Turkey: Issues and Decision Memorandum for the Final Results of the 14th Antidumping Duty Administrative Review* (Oct. 26, 2011) (IA Pub. Doc. No. 5) ("Issues & Decision Memorandum") at 1.[1]

In the Final Results, Commerce rejected Marsan's claims that it was affiliated with Turkish pasta producers Birlik Pazarlama A.S. ("Birlik") and Bellini Gida Sanayi A.S. ("Bellini"), both suppliers to Marsan. The subject entries were therefore liquidated at the rate of 51.49% – a rate that was higher than the rate which would have applied if the companies had been found to be affiliated.

---

[1]The administrative record consists of two sections, designated "Public" and "Non-Public." The "Public" section consists of copies of all documents in the record of this action, with all confidential information redacted. The "Non-Public" section consists of complete, unredacted copies of only those documents that include confidential information.

During the course of this administrative review, Commerce began using an electronic filing system known as IA ACCESS. *See* Pl.'s Brief at 2 n.1 (*citing* Antidumping and Countervailing Duty Proceedings: Electronic Filing Procedures; Administrative Protective Order Procedures, 76 Fed. Reg. 39,263 (Dep't Commerce July 6, 2011)). Certain documents filed through IA ACCESS were submitted to the court under a separate index which was generated by IA ACCESS instead of Commerce's Central Records Unit (CRU). The indices of the public documents provided by each of the two filing systems are not numbered sequentially within the administrative record. The "Public" section of the administrative record is divided into two sections, with one designated as "CRU Pub. Doc. No.___" for documents from the CRU index and the other designated as "IA Pub. Doc. No. _____" for documents from the IA ACCESS index.

All record documents containing business proprietary information are included only in the non-public record generated by CRU and are identified as "Non-Pub. Doc. No. _____."

*See* Principal Brief of Plaintiff Marsan Gida Sanayi ve Ticaret A.S. for Judgment upon the Agency Record Pursuant to Rule 56.2 ("Pl.'s Brief") at 15.

Pending before the Court is the Motion of Plaintiff Marsan Gida Sanayi ve Ticaret A.S. for Judgment on the Agency Record.  Marsan claims that, in determining that Marsan was not affiliated with its suppliers, Commerce misapplied the legal standard for control and failed to adequately consider certain record evidence.  *See generally* Pl.'s Brief at 1-4; Reply Brief of Plaintiff Marsan Gida Sanayi ve Ticaret A.S. for Judgment upon the Agency Record Pursuant to Rule 56.2 ("Pl.'s Reply Brief") at 6-8.  Marsan urges the court to remand the matter to Commerce and to instruct the agency to find Marsan affiliated with its suppliers.  *See* Pl.'s Brief at 24-25; Pl.'s Reply Brief at 15.

Marsan's motion is opposed by the Government and by Defendant-Intervenors – American Italian Pasta Company, Dakota Growers Pasta Company, and New World Pasta Company (collectively, "Domestic Producers") – who maintain that Commerce's determination is supported by substantial evidence and in accordance with law, and should be sustained.  *See generally* Defendant's Response to Plaintiff's Motion for Judgment upon the Agency Record ("Def.'s Brief"); Defendant-Intervenors' Response to the Motion for Judgment on the Agency Record and Supporting Memorandum of Law by Marsan Gida Sanayi ve Ticaret A.S. ("Def.-Ints.' Brief").

Jurisdiction lies under 28 U.S.C. § 1518(c) (2006).[2]  As discussed in detail below, Marsan's Motion for Judgment on the Agency Record must be denied.

## I. <u>Background</u>

---

[2]All citations to federal statutes are to the 2006 edition of the United States Code.  Similarly, all citations to federal regulations are to the 2009 edition of the Code of Federal Regulations.

### A.  Overview of the Statutory and Regulatory Framework

In determining whether two companies are affiliated for purposes of selecting the sales to be

used in an antidumping duty determination, Commerce must examine the relationship between the

companies in accordance with 19 U.S.C. § 1677(33).[3]   Although the statute includes seven

subsections describing what constitutes affiliation, subsection (F) is the sole subsection at issue here.

*See* Pl.'s Brief at 7 (summarizing Marsan's argument under 19 U.S.C. § 1677(33)(F)); *id*. at 15

(explaining that Marsan is affiliated with its suppliers under subsection (F)); *see also id*. at 25

---

[3]According to the statute, "affiliated persons" may be:

> (A) Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants.

> (B) Any officer or director of an organization and such organization.

> (C) Partners.

> (D) Employer and employee.

> (E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.

> (F) Two or more persons directly or indirectly controlling, controlled by, *or under common control with, any person.*

> (G) Any person who controls any other person and such other person.

For purposes of this paragraph, a person shall be considered to control another person if the person is legally or operationally *in a position to exercise restraint or direction* over the other person.

19 U.S.C. § 1677(33) (emphases added).

(same).[4]

Pursuant to subsection (F), "affiliated" parties include "[t]wo or more persons directly or indirectly controlling, controlled by, or under common control with, any person." 19 U.S.C. § 1677(33)(F). Three scenarios of affiliation are thus envisioned by the subsection: (1) two or more persons, directly or indirectly, *controlling* any person; (2) two or more persons, directly or indirectly, *controlled by* any person; and (3) two or more persons, directly or indirectly, *under common control with* any person. *See* 19 U.S.C. § 1677(33)(F). The question of "control" is the key issue in the analysis.

Under the statutory scheme, "control" may exist where a party is merely "legally or operationally *in a position* to exercise restrain or direction over the other party." 19 U.S.C. § 1677(33) (emphasis added). In other words, evidence of the actual exercise of control by one party over another is not required. Rather, the focus is on one party's ability to control another.

In considering affiliation based on control, Commerce is to evaluate, "among others," the following factors: (i) corporate or family groupings; (ii) franchise or joint venture agreements; (iii) debt financing; and (iv) close supplier relationships. 19 C.F.R. § 351.102(b)(3). In addition, the Statement of Administrative Action accompanying the Uruguay Round Agreements Act explains

---

[4]Marsan alludes in passing to subsection (G) of the statute in its principal brief, and to subsection (B) of the statute in its reply brief. *See* Pl.'s Brief at 6, 16; Pl.'s Reply Brief at 1, 2. However, Marsan elsewhere makes it clear that subsection (F) is its sole focus in this action. In any event, Marsan did not brief subsection (B) or (G). By its silence, Marsan has waived any claims it may have had under those provisions. *See*, *e.g.*, SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1319-20 (Fed. Cir. 2006) (explaining, *inter alia*, that it is "well established that arguments not raised in the opening brief are waived"); Novosteel SA v. United States, 284 F.3d 1261, 1273-74 (Fed. Cir. 2002) (same).

that, in evaluating the existence of affiliation based upon control, Commerce is to consider not only whether control arises from traditional relationships (such as the specific relationships enumerated in the agency's regulations), but also from more "modern business arrangements." *See* Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 6 at 838 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4174-75 ("SAA").[5]  The focus on more "modern business arrangements" is intended to reflect the realities of the marketplace.  *See id.*

Finally, the existence of one of these relationships – while necessary – is not sufficient to support a determination of affiliation based on control.  Commerce will find affiliation based on control only if the relationship in question "has the potential to impact decisions concerning the production, pricing, or cost of the subject merchandise."  19 C.F.R. § 351.102(b)(3).

## B.  The Facts of This Case

Marsan commenced this action to contest the results of the 14th administrative review of the antidumping duty order on pasta from Turkey for the period of July 1, 2009 to June 30, 2010 (the "period of investigation").  *See* Issues & Decision Memorandum at 1.

From the outset of the administrative review, Marsan argued that it was affiliated with its suppliers pursuant to each of the seven subsections of 19 U.S.C. § 1677(33).  *See* Issues & Decision Memorandum at 2.  In its Preliminary Results, Commerce found insufficient evidence to support any

---

[5]The SAA "represents an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements."  SAA at 656.  The SAA notes the Administration's understanding that "it is the expectation of the Congress that future Administrations will observe and apply the interpretations and commitments set out in [the] Statement."  *Id.*

of Marsan's affiliation claims, and therefore made an initial determination that Marsan was not so affiliated. *See* Certain Pasta From Turkey: Notice of Preliminary Results of Antidumping Duty Administrative Review, 76 Fed. Reg. 23,974, 23,975-77 (Dep't Commerce April 29, 2011) ("Preliminary Results"). Following publication of the Preliminary Results, Marsan filed an administrative case brief with Commerce, arguing that the agency erred in its analysis of Marsan's affiliation arguments under each of the seven subsections of the statute. *See* Issues & Decision Memorandum at 2 (noting that Marsan argued that it was affiliated with its suppliers pursuant to sections (A)-(G) of 19 U.S.C. § 1677(33)).

The record of the underlying agency proceeding documents Commerce's careful and thorough consideration of Marsan's claims of "affiliation" pursuant to each statutory provision, both at the Preliminary Results stage and, again, in the agency's issuance of the Final Results. In the Issues & Decision Memorandum accompanying the Final Results, Commerce summarized its analysis of the arguments that Marsan made claiming affiliation under each of the seven subsections of the statute, and once again concluded that Marsan was not affiliated with its suppliers under any of the subsections. *See* Issues & Decision Memorandum at 3-5.

For purposes of this action, Marsan has narrowed its focus to a single theory of affiliation, under subsection (F). Marsan contends that both Marsan and Birlik/Bellini (Marsan's suppliers) were under the *common control* of the Ülker group, a Turkish conglomerate in the food sector. Specifically, Marsan asserts that the Ülker group was in a position to control Birlik/Bellini by virtue

of being their parent company.  Pl.'s Brief at 4.[6]  In addition, Marsan contends that the Ülker group

was in a position to control Marsan via Mr. Tevfik Arikan, as described in detail below.  It is this

latter relationship of alleged control – *i.e.*, the Ülker group's ability to control Marsan, via Mr.

Arikan – that is in dispute.

Marsan made a two-prong argument to Commerce in an effort to establish the Ülker group's

ability to control Marsan.  It is this argument that lies at the heart of this case.  Marsan first argued

that *the Ülker group* was in a position to control Marsan via *Mr. Arikan*, a top-level General

Manager within the Ülker group[7] and a member of the board of directors of one of Ülker's

subsidiaries, Pasifik Tuketim Urunleri A.S. ("Pasifik").  *See* Pl.'s Brief at 9, 11 n.2, 15; Marsan Case

Brief (CRU Pub. Doc. No. 43) ("Case Brief") at 10.  And, second, Marsan argued that *Mr. Arikan*

– in turn – was in a position to control *Marsan* by virtue of his service as vice-chairman of Marsan's

five-member board of directors.  *See* Case Brief at 9-19; Pl.'s Brief at 15, 22.  Marsan maintains that,

through these two relationship links (*i.e.*, the Ülker group/Mr. Arikan and Mr. Arikan/Marsan), the

---

[6]In its Complaint, Marsan alleged that Ülker Biskuvi A.S. ("Ülker Biskuvi") – the Ülker group's flagship company – was in a position to control Marsan and its suppliers.  Complaint ¶16. In contrast, in its principal brief Marsan argues that the Ülker group itself was in a position of control.  *See* Pl.'s Brief at 1.  Marsan attempts to clarify its position in its reply brief, stating that the entity in a position to control Marsan and its suppliers was Ülker Biskuvi or, alternatively, its chairman, Mr. Murat Ülker.  *See* Pl.'s Reply Brief at 1.

Whether the Ülker group, its flagship company (Ülker Biskuvi), or its chairman (Mr. Ülker) is the party alleged to be in a position to control Marsan and its suppliers has no material effect on the factual analysis at hand.  Thus, for the sake of simplicity, the third party that Marsan claims is in a position of common control over Marsan and its suppliers is referred to herein as the Ülker group.

[7]Mr. Arikan's title was General Manager of Shared Services in the Ülker group's Customer Relationship and Distribution Channel Coordination.  Case Brief at 10; Pl.'s Brief at 11 n.2.

Ülker group was in a position to control Marsan, because – according to Marsan – Mr. Arikan served on Marsan's board of directors "as a direct representative of the Ülker [g]roup." Pl.'s Brief at 11; *see also* Case Brief at 11, 25-27.

Marsan provided Commerce with extensive information concerning Marsan's business dealings with its suppliers, as alleged evidence of the Ülker group's ability to control Marsan. *See* Pl.'s Brief at 14; Case Brief at 11. For example, Marsan explained that, prior to the period of review, Marsan owned and operated a pasta production facility in Hendek, Turkey and sold the pasta produced at that facility under its own brand name – PIYALE. Pl.'s Brief at 14. Marsan further explained that, during the period of review, Marsan and the Ülker group's subsidiaries – Birlik and Bellini – entered into a production agreement and a lease for the entire Hendek facility. Pursuant to the agreement, Marsan agreed to lease its pasta-producing assets to Birlik, and Birlik agreed to produce Marsan's brand of PIYALE pasta. Pl.'s Brief at 12-14. Shortly thereafter, the ownership of all of Marsan's pasta-producing assets was transferred to Bellini. Pl.'s Brief at 12-14; Pl.'s Reply Brief at 5.[8] Ultimately, Marsan retained ownership over the Hendek facility buildings and silos, as well as the soft wheat milling equipment. However, Marsan's pasta was produced by Birlik/Bellini, and Bellini became the owner of all other pasta-producing assets that had previously belonged to Marsan. Pl.'s Brief at 12-13.

Marsan argued that the transfer of assets and the production agreement significantly altered its business structure. According to Marsan, the "transformation" from pasta producer to pasta trader

---

[8]The pasta-producing assets included a soft-wheat mill for the production of bread flour, and a durum-wheat mill for the production of semolina (used in making pasta), as well as a pasta production plant. Pl.'s Brief at 8-9.

that followed the transfer of its pasta-production assets to Birlik/Bellini resulted in Marsan's loss of control over the production of its own brand of pasta, its profits, and – since it was no longer the buyer of raw materials – the cost of its pasta. *See* Pl.'s Brief at 14.

Marsan claimed that the transfer of its pasta-producing assets to Bellini, one of its suppliers, would never have occurred absent some influence by the Ülker group on Marsan's board of directors. *See* Pl.'s Brief at 12-14; Case Brief at 25-27. Marsan further maintained that the transfer of its assets was financially detrimental to Marsan. In particular, Marsan argued that the lease was "hardly favorable to Marsan" because the rent paid by Birlik/Bellini was equal only to the value of the depreciation on the plant and equipment. Pl.'s Brief at 14.

In an effort to buttress its argument that Mr. Arikan served as a "representative" of the Ülker group on Marsan's board, Marsan pointed to a wide range of facts illustrating the shared business interests between Marsan's principal shareholder, Mr. Latif Topbaş,[9] and the chairman of the Ülker group, Mr. Murat Ülker. Marsan noted, *inter alia*, the ownership of minority shares by the Ülker group's flagship company – Ülker Biskuvi – in Birlesik Magazalar A.S. ("BIM"), a Turkish supermarket chain in which Mr. Topbaş held a minority interest and where he served as chairman of the board of directors. Case Brief at 32; Pl.'s Brief at 8-12. In addition, Marsan noted that, during the period of review, Mr. Topbaş – who owned Marsan and served as the chairman of its board – also had "substantial holdings and directorship in the Ülker [g]roup." Pl.'s Brief at 11. Marsan explained that Mr. Topbaş and his brothers "together have an investment of over $40 million in no

_____

[9]Mr. Topbaş and his relatives are the sole owners of Marsan, via a holding company. Pl.'s Brief at 8.

fewer than 10 Ülker manufacturing, distribution or sub-holding subsidiaries."  Pl.'s Brief at 11.

Marsan pointed out that Mr. Topbaş and his brothers were also members of the boards of directors

and had ownership interests in various Ülker companies.  Pl.'s Brief at 11.[10]

Marsan coined the phrase "an economic community of interests" to characterize this web of

shared business interests.  Issues & Decision Memorandum at 7; Pl.'s Brief at 22.  According to

Marsan, the "economic community of interests" explained why Mr. Topbaş allowed an Ülker group

"representative" – Mr. Arikan – to sit on Marsan's board.  *See* Pl.'s Brief at 12, 22.

Commerce waded through the extensive, detailed information that Marsan placed on the

record in the course of the administrative review, but ultimately determined in the Final Results that

the positions that Mr. Arikan held in Ülker group companies were not sufficient to establish that he

served on Marsan's board on behalf of the Ülker group.  Issues & Decision Memorandum at 13.

Commerce further found that Mr. Arikan's position on Marsan's board was not sufficient to prove

---

[10]At the administrative level, Marsan emphasized this "economic community of interests" not only to explain why Mr. Topbaş, as owner of Marsan, would welcome an Ülker representative as vice-chairman of the Marsan board, but also to advance an alternative theory of affiliation.  Pl.'s Brief at 12-13.

Under that alternative theory of affiliation, Marsan contended that the economic interests of Mr. Topbaş and Mr. Ülker were so intertwined that they gave rise to a "corporate grouping" within the meaning of 19 C.F.R. § 351.102(b)(3).  Pl.'s Brief at 11.  Marsan argued that it was this "Topbaş-Ülker" corporate grouping that was in a position to restrain and control Marsan and its suppliers, rendering Marsan and Birlik/Bellini affiliated.  Pl.'s Brief at 12.  However, Marsan has not pursued this alternative theory of affiliation in this action.  *See* Pl.'s Reply Brief at 7-8 (explaining that, in this forum, Marsan does not claim that "the intertwining of economic interests" creates affiliation).

As discussed below, Marsan's contention in this action is that Commerce failed to consider the "economic community of interests" in determining whether the Ülker [g]roup (via Mr. Arikan) was in a position to exercise restraint or control over Marsan.  *See* section III.A.2, *infra*.

that Mr. Arikan was in a position to directly or indirectly control Marsan.  Issues & Decision

Memorandum at 13.  As for the history of business dealings between Marsan and its suppliers, and

the "economic community of interests" between Mr. Ulker and Mr. Topbaş, Commerce determined

that none of the evidence was indicative of affiliation.  Issues & Decision Memorandum at 13-14.

Commerce therefore concluded in the Final Results that Marsan had failed to establish affiliation

under any of the seven subsections of 19 U.S.C. § 1677(33).  *See* Issues & Decision Memorandum

at 1, 7-8.

In light of its negative affiliation determination in the Final Results and in accordance with

its reseller policy, Commerce instructed the Bureau of Customs and Border Protection to liquidate

entries for which Birlik was the producer and Marsan the exporter at the "all others" rate of 51.49%.

Pl.'s Brief at 25; Def.'s Brief at 6.[11]

This action followed.

---

[11]Under the reseller policy, company-specific assessment rates are based on the sale by the first company in the commercial chain that had knowledge that the merchandise was destined to the United States.  *See* Antidumping and Countervailing Duty Proceedings: Assessment of Antidumping Duties, 68 Fed. Reg. 55,361, 55,362 (Oct. 15, 1998).

Here, because Marsan and its suppliers were found not to be affiliated, under the agency's reseller policy, Marsan's suppliers, as the producers of the merchandise, were treated as the first to know that the merchandise was destined for the United States.  Def.'s Brief at 5-6; *see also* Preliminary Results, 76 Fed. Reg. at 23,977.  Accordingly, since Marsan's suppliers were not covered by the administrative review and did not have a company-specific rate from an earlier segment of the proceeding, the rate applied in liquidating the subject merchandise was not the rate applicable to Marsan, but – rather – the "all others" rate.  Def.'s Brief at 5-6; *see also* Preliminary Results, 76 Fed. Reg. at 23,977.

## I.  Standard of Review

In reviewing a challenge to a final determination, Commerce's determination must be upheld unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with the law."  19 U.S.C. § 1516a(b)(1)(B)(i).  "Substantial evidence" is "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Universal Camera Corp. v. NLRB, 340 U.S. 474, 477-78 (1951) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)); see also Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966) (defining "substantial evidence" as "something less than the weight of the evidence").

It is, of course, true that any evaluation of the substantiality of evidence "must take into account whatever in the record fairly detracts from its weight," including "contradictory evidence or evidence from which conflicting inferences could be drawn."  Suramerica de Aleaciones Laminadas, C.A. v. United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting Universal Camera Corp., 340 U.S. at 487-88); see also Mittal Steel Point Lisas Ltd. v. United States, 548 F.3d 1375, 1380-81 (Fed. Cir. 2008) (same).  However, the mere fact that it may be possible to draw two inconsistent conclusions from the record does not prevent the agency's determination from being supported by substantial evidence.  Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001); see also Consolo, 383 U.S. at 620.

Finally, while Commerce must explain the bases for its decisions, "its explanations do not have to be perfect."  NMB Singapore Ltd. v. United States, 557 F.3d 1316, 1319 (Fed. Cir. 2009).  Nevertheless, "the path of Commerce's decision must be reasonably discernable" to support judicial

review.  NMB Singapore Ltd., 557 F.3d at 1319 (*citing* Motor Vehicle Mfrs. Ass'n v. State Farm

Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)); *see also* Timken U.S. Corp. v. United States, 421 F.3d

1350, 1355 (Fed. Cir. 2005) (explaining that "it is well settled that an agency must explain its action

with sufficient clarity to permit 'effective judicial review,'" and that "[f]ailure to provide the

necessary clarity requires the agency action be vacated") (*quoting* Camp v. Pitts, 411 U.S. 138, 142-

43 (1973)); 19 U.S.C. § 1677f(i)(3)(A) (requiring Commerce to "include in a final determination .

. . an explanation of the basis for its determination").

### III.  Analysis

Marsan here challenges Commerce's determination that Marsan is not affiliated with its

suppliers, Birlik/Bellini, to the extent that the agency's determination is based on subsection (F) of

the statute, which concerns affiliation based upon control.  *See* Pl.'s Brief at 7, 15, 25; Pl.'s Reply

Brief at 1-3, 5, 14; 19 U.S.C. § 1677(33).

Marsan contests Commerce's determination on four principal grounds.  First, Marsan

contends that Commerce failed to adequately take into account certain evidence pertinent to the

agency's affiliation analysis.  *See* Pl.'s Brief at 16, 19, 24; *see also* section III.A, *infra*.  Second,

Marsan faults Commerce for evaluating theories of affiliation beyond those that Marsan has argued.

Pl.'s Brief at 20-21, 16, 24; *see also* section III.B, *infra*.  Third, Marsan asserts that Commerce failed

to properly apply relevant legal standards in the course of its affiliation analysis.  *See* Pl.'s Brief at

15-20; *see also* section III.C, *infra*.  And, fourth, Marsan argues that Commerce erred in not

conducting an on-site verification of Marsan's questionnaire responses.  *See* Pl.'s Brief at 22-23; *see*

*also* section III.D, *infra*.

Each of Marsan's arguments is lacking in merit.

### A.  Commerce's Evaluation of the Record Evidence

Marsan attacks Commerce's affiliation determination on the grounds that Commerce failed to properly consider evidence concerning two relationships that are critical to Marsan's theory of affiliation – the relationship between Mr. Arikan and Marsan, and the relationship between the Ülker group and Mr. Arikan.

As summarized above, Marsan's overarching theory of affiliation is that Marsan and its suppliers, Birlik/Bellini, were affiliated because both Marsan and Birlik/Bellini were *under the common control* of the Ülker group – *i.e.*, that the Ülker group was in a position to control both Marsan and Birlik/Bellini.  Establishing the Ülker group's ability to control Birlik/Bellini is a relatively straightforward matter, because the Ülker group is the parent of Birlik/Bellini.  On the other hand, the Ülker group's ability to control Marsan is hotly contested.

Marsan claims that the Ülker group was in a position to control Marsan, *via Mr. Arikan*.  This part of Marsan's theory of control is thus rather attenuated.  In other words, to prove that Marsan was subject to the control of the Ülker group, Marsan must establish *both* (1) that Mr. Arikan was in a position to control Marsan *and* (2) that the Ülker group was in a position to control Mr. Arikan.  As outlined below, Commerce did not err in concluding that Marsan failed on both counts.

Marsan first takes issue with Commerce's determination that Mr. Arikan was not "in a position to control Marsan" by virtue of his position on Marsan's board.  Pl.'s Brief at 4, 17-18; *see* section I.B, *supra*.  In addition, Marsan contends that Commerce improperly accounted for certain evidence that Marsan submitted in support of its claim that Mr. Arikan served on Marsan's board

as a "representative" of the Ülker group.  Pl.'s Brief at 19, 22; Pl.'s Reply Brief at 6, 7-8, 15.  Neither

challenge is persuasive.

### 1.   Whether Mr. Arikan Was Positioned to Control Marsan

Marsan contends that Commerce's determination that Mr. Arikan was not in a position to

exercise control over Marsan lacks an adequate evidentiary basis.  *See* Pl.'s Brief at 4, 16-17, 19-20;

Pl.'s Reply Brief at 5-6, 8-10.  Specifically, Marsan argues that Commerce failed to accord proper

weight to Mr. Arikan's position as vice-chairman of Marsan's board of directors, which – according

to Marsan – in turn constituted evidence of the Ülker group's ability to control Marsan.  Pl.'s Brief

at 4, 11, 15-16, 18; Pl.'s Reply Brief at 2, 5-6.  Marsan contends that, as a member of the Marsan

board, Mr. Arikan directed the "strategy and direction of the company" and was thus in a position

to legally or operationally exercise restraint or control over Marsan.  Pl.'s Brief at 18.

In the Issues & Decision Memorandum, Commerce determined that Mr. Arikan's role was

limited to that of a board member (albeit the vice-chairman of the board), and that there was no

showing that Mr. Arikan individually had any authority to make decisions on behalf of Marsan.  *See*

Issues & Decision Memorandum at 13; Def.'s Brief at 14-15.  Commerce concluded that Mr.

Arikan's position as vice-chairman of the Marsan board did not suffice to demonstrate that he was

in a position to control that company.  *See* Issues & Decision Memorandum at 13.

As a threshold matter, the administrative record includes no "directives, minutes from

meetings or other documentation" that might serve as direct proof that Mr. Arikan was in a position

to control Marsan.  Issues & Decision Memorandum at 13.  Moreover, as the Domestic Producers

observe, it generally takes a majority of the board of directors to exercise control over a company

– not one director alone.  Def.-Ints.' Brief at 11.  In this case, Mr. Arikan might have exercised

restraint or direction over Marsan if he were the sole member of the company's board.  But the

Marsan board consisted of five members.  Pl.'s Brief at 18.

There is nothing in the record here to indicate that Mr. Arikan or any other single Marsan

board member possessed any greater powers than those enjoyed by individual directors serving on

typical boards.  Nor is there any record evidence to indicate that, as vice-chairman of the Marsan

board, Mr. Arikan's voice or vote was any more potent than those of his four colleagues.

Commerce's determination that Mr. Arikan was not in a position to control Marsan thus was

supported by substantial evidence.  *See* Def.'s Brief at 11-12 (*citing* Issues & Decision Memorandum

at 12).[12]

Marsan's claims to the contrary have no merit.[13]

_____

[12]For the first time in its reply brief, Marsan refers to other members of the Marsan board who are also asserted to have relationships with the Ülker group.  *See* Pl.'s Reply Brief at 9 (stating that one member of Marsan board was former auditor in Ülker group, and second was related to Mr. Topbaş).  Marsan seems to suggest that these two individuals – together with Mr. Arikan – controlled Marsan on behalf of the Ülker group.

However, Commerce took these other relationships into account in reaching its negative determination on affiliation.  Issues & Decision Memorandum at 5, 7-8.  Thus, for example, as the Issues & Decision Memorandum explained, the fact that "board members of one company are officers of another company" does not constitute affiliation pursuant to subsection (F) of the statute.  Issues & Decision Memorandum at 8.  Moreover, Marsan has pointed to no evidentiary support for its implication that the Ülker group was in a position to control all three of these individuals.

[13]Because (as detailed above) Marsan's theory of affiliation requires that it establish both (1) that Mr. Arikan was in a position to control Marsan and (2) that the Ülker group was in a position to control Mr. Arikan, sustaining Commerce's determination as to prong (1) obviates the need to reach Marsan's arguments vis-a-vis prong (2).

Nevetheless, for the sake of completeness, Marsan's "substantial evidence" challenge to

2.  Whether The Ülker Group Was Positioned to Control Mr. Arikan

Marsan similarly contends that Commerce failed to properly consider evidence that –

according to Marsan – demonstrates that the Ülker group controls Mr. Arikan by virtue of his

employment within the Ülker group.  Marsan argues that, because of this control, Mr. Arikan (the

vice-chairman of Marsan's board of directors) serves on the Marsan board as a "representative" of

the Ülker group and on the Ülker group's behalf.  *See* Pl.'s Brief at 19-20, 22, 23; Pl.'s Reply Brief

2-3, at 6.

Marsan first alleges that Commerce failed to adequately consider the many overlapping

economic interests between Marsan and the Ülker group in determining whether Mr. Arikan acted

as a "representative" of the Ülker group on Marsan's board.  *See* Pl.'s Brief at 22; Pl.'s Reply Brief

at 7-8 (asserting that "the intertwining economic interests . . . show[] why . . . affiliation is a natural

outcome of the relationships among the parties").  According to Marsan, it is the existence of the

economic community of interests between Marsan and the Ülker group that explains why Marsan

would allow an Ülker "representative" – Mr. Arikan – to sit on Marsan's board.  *See* Pl.'s Brief at

22 (arguing that "the economic community of interests between Topbaş and Ülker . . . show[s] why

Commerce's determination concerning the Ülker group's ability to control Mr. Arikan (prong (2))
is addressed in section III.A.2, below.  *See generally* section III.A.2, *infra* (analyzing, and rejecting,
Marsan's "substantial evidence" challenge to Commerce's determination that Ülker group was not
in a position to control Mr. Arikan).

By the same token, the conclusion that there is no merit to Marsan's "substantial evidence"
challenge to Commerce's determination that the Ülker group was not in a position to control Mr.
Arikan (*see* section III.A.2, *infra*) moots Marsan's "substantial evidence" challenge to Commerce's
determination that Mr. Arikan was not in a position to control Marsan – the issue that is analyzed,
and rejected, here (*i.e.*, in section III.A.1).

Topbaş would afford  Ülker the possibility of exercising restraint or direction over Marsan"); Pl.'s

Reply Brief at 7-8 (same).  Marsan thus views the economic community of interests as proof that Mr.

Arikan's service on Marsan's board was as a "representative" of the Ülker group and on its behalf.

*See* Pl.'s Brief at 4, 8-11 (summarizing economic community of interests and stating that Mr. Arikan

serves on Marsan board as a "representative" of Ülker group); Pl.'s Reply Brief at 5-6, 8 (same).

But Marsan's claim that Commerce failed to adequately consider evidence of the overlapping

economic interests of Marsan and the Ülker group is not borne out by the record.  The Issues &

Decision Memorandum amply evidences Commerce's consideration of Marsan's "economic

community of interests" argument.  Commerce scrutinized the facts that Marsan identified (*i.e.*, the

overlapping economic interests between Marsan and the Ülker group) and evaluated whether, as a

matter of law, those facts were sufficient to demonstrate the ability to control.  *See generally* Issues

& Decision Memorandum at 8-10, 12-15.

For example, as Commerce candidly acknowledged, the evidence placed on the record by

Marsan indicates that Marsan and the Ülker group may well "share a common interest in the food

and beverage industry in Turkey."  Issues & Decision Memorandum at 8.  However, as a matter of

law, those shared interests do not establish that Marsan and the Ülker group are affiliated within the

meaning of the statute.  *See generally id*.  Marsan cites nothing to cast doubt on Commerce's expert

judgment to that effect.

Commerce similarly considered the corporate relationships of Marsan and the Ülker group,

and the relationship between the Topbaş and Ülker families. Issues & Decision Memorandum at 7-8.

Thus, Commerce analyzed, among other things, Mr. Arikan's role on the Marsan board and the fact

that Mr. Topbaş and Mr. Ülker each own common (non-controlling) shares in the Turkish supermarket chain, BIM.  *See generally* Issues & Decision Memorandum at 12-15.

Ultimately, however, Commerce determined that the facts and relationships that Marsan cited in support of its "economic community of interests" argument did not advance Marsan's claim that Mr. Arikan served on Marsan's board as a "representative" of the Ülker group.  Issues & Decision Memorandum at 13.  As Commerce explained, the bottom line is that none of the information and evidence on which Marsan relies concerning the asserted economic community of interests establishes that Marsan or its board in fact acted in the company's business dealings at the command of Mr. Arikan (on behalf of the Ülker group), or even that Mr. Arikan was in a position to exercise such control.  Issues & Decision Memorandum at 13.  As the Government puts it, Marsan can cite no evidence whatsoever of a "causal link indicative of the potential to 'control.'"  Def.'s Brief at 13.[14]

In short, contrary to Marsan's claims, Commerce adequately considered the record evidence of the "economic community of interests" between Marsan and the the Ülker group.  That Marsan disagrees with the conclusions that Commerce drew based on that evidence in no way detracts from the reasonableness of the agency's determination.

Marsan further argues that, in determining whether Mr. Arikan served on Marsan's board as

---

[14]In its reply brief, Marsan argues that it does not have to "adduce some 'causal link'" to show that the Ülker group controls Marsan.  *See* Pl.'s Reply Brief at 6.  According to Marsan, its representation that Mr. Arikan is an "Ülker nominee on Marsan's board" is sufficient evidence to meet the "control" requirement of the statute.  *Id.*  However, that is precisely the evidentiary link that Commerce has found lacking.  As Commerce explained in the Issues & Decision Memorandum, the evidence cited by Marsan fails to demonstrate that Mr. Arikan is controlled by the Ülker group, or that Mr. Arikan controls Marsan.  Issues & Decision Memorandum at 13.

a "representative" of the Ülker group, Commerce failed to give adequate consideration to the facts surrounding what Marsan characterizes as the "hollowing-out" of Marsan during the period of review. Pl.'s Brief at 24. According to Marsan, its pasta-producing assets were transferred to the Ülker group subsidiaries, Birlik/Bellini, "with no consideration other than the payment of depreciation expenses." Pl.'s Brief at 20. Marsan points to this absence of profit in the transaction as proof that the asset transfer could not have occurred absent some influence by the Ülker group over Marsan's board. *See* Pl.'s Reply Brief at 14. Marsan contends that the transaction thus is evidence that Mr. Arikan served as a "representative" of Ülker group interests on the Marsan board. *See* Pl.'s Brief at 19-20 (asserting that Marsan's "transformation [was] so exceptional that it can be characterized as mere commercial dealing only by deliberately ignoring the fact that Ülker's representative was vice-chairman of Marsan's board").

In the Issues and Decision Memorandum, Commerce reviewed the terms of the business dealings between Marsan and the Ülker group, and found nothing that was inconsistent with ordinary business transactions. *See* Issues & Decision Memorandum at 14-15. For example, the production contract between Marsan and Birlik (in which Birlik agreed to produce Marsan's brand of pasta and sell it to Marsan) specified that the price of the product sold to Marsan was to be jointly determined by both parties based on "market conditions." Issues & Decision Memorandum at 14-15. Moreover, nothing in the contract prevented Marsan from purchasing pasta from sources other than Birlik. Issues & Decision Memorandum at 14.

Commerce also reviewed the lease agreement for the pasta production facility entered into by Marsan and Birlik, and, again, found nothing particularly striking. *See* Issues & Decision

Memorandum at 14-15.[15]  Thus, for example, the lease required Birlik to pay Marsan not only a lease

fee, but also the cost of the equipment, raw material, labor, energy, and other overhead provided.

Issues & Decision Memorandum at 15.  Birlik further assumed all liability in connection with the

production facility, and was required to provide warehouse storage for Marsan's inventory.  *See* Pl.'s

Appx. at Tab 2, Exh. 2 (Marsan-Birlik Lease and Production Agreement); Issues & Decision

Memorandum at 10.

      In analyzing Marsan's claims of affiliation, Commerce thus considered the terms of the

production contract and the lease agreement, and determined that "[n]othing about [them] . . . shows

evidence of affiliation or control."  *See generally* Issues & Decision Memorandum at 13-15.

Specifically, Commerce concluded that the agreements indicated "that the commercial interests of

both parties were taken into consideration," and that the specific terms reflected "negotiation

between the parties," rather than "control by either entity."  Issues & Decision Memorandum at 15.

      Notwithstanding the charges of irregularity that Marsan has leveled, there appears to be

nothing about the transactions at issue that is anything other than routine.  Even more to the point,

---

[15]As discussed herein, the Issues & Decision Memorandum reflects Commerce's close review of various contracts and business dealings between Marsan and the Ülker group for purposes of addressing Marsan's contention that those transactions constituted evidence that Mr. Arikan served on Marsan's board  as a representative of as a "representative" of the Ülker group.  However, Commerce made no specific determination as to whether the progressive transfer of Marsan's assets to its suppliers was an "arm's length" transaction.  Nor was the agency required to do so.  As Commerce explained in the Issues & Decision Memorandum, even if the transfer of assets from Marsan to Birlik/Bellini was not at arm's length, that fact would not constitute "irrefutable evidence of affiliation."  Issues & Decision Memorandum at 14.  Moreover, under the statute, whether or not transactions are at arm's length is not a factor in determining affiliation.  *See* Issues & Decision Memorandum at 14.  In accordance with agency regulations, Commerce "first determines whether parties are affiliated and then considers whether their transactions are arm's length."  *Id.* (*citing* 19 C.F.R. § 351.403(d)).

even assuming, *arguendo*, that something about the terms of the various business dealings could be interpreted to be unusual, there is no evidence whatsoever to suggest that Mr. Arikan – one of five members of the Marsan board – was in a position to exercise control over Marsan for purposes of such contract negotiations.  Issues & Decision Memorandum at 13.

Commerce therefore properly concluded that the history of business dealings between Marsan and the Ülker group – including, in particular, the circumstances surrounding the transfer of Marsan's pasta-producing assets to Birlik/Bellini – were not sufficient to demonstrate that the transactions were at the direction of Mr. Arikan or that Mr. Arikan served on Marsan's board on behalf of the Ülker group.  Issues & Decision Memorandum at 13.  Marsan's claims to the contrary must be rejected.[16]

In sum, Commerce gave proper consideration to Marsan's evidence concerning both the "economic community of interests" between Marsan and the Ülker group, and the history of business dealings between the two.  Commerce's determinations therefore must be sustained.

B.  Commerce's Consideration of Additional Theories of "Control"

Two of Marsan's remaining arguments amount to complaints that Commerce's analysis in the Issues & Decision Memorandum evaluated additional theories of control above and beyond the particular theory that Marsan focuses on in this action.

---

[16]As previously noted, this rejection of Marsan's "substantial evidence" challenges to Commerce's determination that the Ülker group was not in a position to control Mr. Arikan renders it unnecessary to consider Marsan's "substantial evidence" challenges to Commerce's determination that Mr. Arikan was not in a position to control Marsan – the issue analyzed in section III.A.1 above.  *See* n.13, *supra*; section III.A.1, *supra* (analyzing, and rejecting, Marsan's "substantial evidence" challenge to Commerce's determination that Mr. Arikan was not in a position to control Marsan).

Specifically, Marsan criticizes Commerce because the Issues & Decision Memorandum considers whether or not Marsan had a "close supplier relationship" with Birlik/Bellini – an issue that Marsan here characterizes as a "straw man" which, according to Marsan, the agency "came up with . . . simply to justify its finding of non-affiliation."  Pl.'s Brief at 20-21; *see also* Pl.'s Brief at 16 (referring to Commerce's "close supplier" analysis as part of an alleged "bait-and-switch game"); Pl.'s Brief at 24 (asserting broadly that "Commerce's conclusion that Marsan and Birlik/Bellini are not affiliated because they . . . do not have a 'close supplier relationship' is legally wrong because it relies on an erroneous legal test, and it is factually wrong because it fails to take into account evidence pertinent to the correct legal test of [§ 1677(33)(F)] of the statute").[17]

As discussed above, however, Marsan's claims at the administrative level were much broader, and encompassed all seven subsections of the statute.  *See generally* section II.B, *supra*; *see also* Case Brief at 3 (asserting existence of affiliation "by reason of subparagraphs (A) through (E)," as well as "under the control subsections, (F) and (G)").  Further, the applicable regulation instructs that, "[i]n determining whether control over another person exists" for purposes of subsections (F) and (G) of the statute, Commerce is to consider, *inter alia*, the existence of "close supplier relationships."  19 C.F.R. § 351.102(b)(3).

---

[17]Read in context, this assertion – which appears in the "Conclusion" section of Marsan's principal brief – alleges nothing more than that Commerce's Issues & Decision Memorandum improperly focused on the existence of a "close supplier relationship" (rather than properly analyzing affiliation under the two theories that Marsan pursues in this action).  Nowhere in the briefs that Marsan has filed in this forum does Marsan claim that there was a "close supplier relationship" between Marsan and Birlik/Bellini, or that Commerce should have found "affiliation" based on that theory.  Indeed, as discussed above, Marsan now disclaims any reliance on the concept of a "close supplier relationship."  Marsan now contends that its earlier references to  a "close supplier relationship" were "plainly not central to the factual development of the case."  *See* Pl.'s Brief at 21.

In fact, in the administrative case brief that it filed with Commerce, Marsan expressly challenged the merits of the agency's determination in the Preliminary Results that "Marsan and Birlik/Bellini are not affiliated by reason of . . . a close supplier relationship," asserting that "[the agency's] analysis is flawed and its conclusions are wrong." *See* Case Brief at 4.  Under these circumstances, Commerce's decision to analyze the existence of a "close supplier relationship" in the Issues & Decision Memorandum cannot fairly be criticized.  The agency did nothing more than address an argument that Marsan itself had raised.  *See generally* Def.'s Brief at 14-15 (explaining that Commerce analyzed "close supplier relationship" because, if established, such relationship "could . . . demonstrate Birlik/Ülker being in a position to control Marsan"); Def.-Ints.' Brief at 19-21 (same).

Marsan also faults Commerce for considering whether "either Marsan or Birlik are in a position to be controlled, either legally or operationally, by each other."  *See* Pl.'s Brief at 20 (*quoting* Issues & Decision Memorandum at 13).  Marsan contends that it "does not claim that Birlik was in a position to control Marsan or that Marsan was in a position to control Birlik."  Pl.'s Brief at 20.  *But see* Def.-Ints.' Brief at 20 (noting that, at administrative level, Marsan argued that Marsan and Birlik were affiliated under all seven subsections of the statute, and, further, explaining that "[a]ffiliation would exist under subsection (G) if Marsan controlled Birlik, or vice versa").

In any event, whether or not Marsan has ever claimed that Birlik was in a position to control Marsan (or vice versa) is of no moment.  Even assuming that – in the interest of completeness or out of an abundance of caution – the Issues & Decision Memorandum considered theories of control *above and beyond* those that Marsan asserted, there was no resulting injury to Marsan.  In this action,

what matters is whether Commerce adequately and properly considered the theories of affiliation that *were* raised before the agency (to the extent that Marsan's claims of alleged agency error have been properly preserved and presented here).

In sum, there is no substance to Marsan's criticisms of the Issues & Decision Memorandum for addressing whether a "close supplier relationship" existed between Marsan and Birlik/Bellini, and whether Marsan or Birlik/Bellini were in a position to be controlled by each other.  Even Marsan does not contend that Commerce's consideration of those other theories affected in any way the agency's determinations on the only theory of affiliation that Marsan continues to press here.

## C.  The Legal Standards That Commerce Applied

The gravamen of several of Marsan's other arguments is that Commerce failed to properly apply various legal standards in the course of the agency's analysis.  Thus, for example, Marsan insists that Commerce improperly applied a standard of "actual control."  *See* Pl.'s Brief at 4, 17-18; Pl.'s Reply Brief at 7; 19 U.S.C. § 1677(33).  Marsan similarly maintains that Commerce improperly required Marsan to demonstrate that it was subject to "unilateral control."  *See* Pl.'s Brief at 18-19, 20; Pl.'s Reply Brief at 6.  In addition, Marsan contends that Commerce improperly interpreted the statute to require Marsan to demonstrate the existence of "cross-ownership that 'controls' or has the ability to control Marsan."  *See* Pl.'s Brief at 21 (*quoting* Issues & Decision Memorandum at 13); *see also* Pl.'s Brief at 16-17, 24; Pl.'s Reply Brief at 8.

As detailed below, none of these arguments holds water.

## 1. Actual Control vs. Ability to Control

Marsan first insists that, in its analysis of affiliation, Commerce improperly imposed a higher, more stringent standard of "actual control," when the relevant statute requires only that an entity be "in a position" to control (*i.e.*, have the ability to control) another entity. *See* 19 U.S.C. § 1677(33); Pl.'s Brief at 4, 17-18; Pl.'s Reply Brief at 7; *see also* Antidumping Duties; Countervailing Duties, 62 Fed. Reg. 27,296, 27,297-98 (May 19, 1997) (explaining that the statute requires Commerce to focus "on the ability to exercise 'control' rather than the actuality of control over specific decisions").

As support for its charge, Marsan points to an excerpt from the Issues & Decision Memorandum in which Commerce noted the absence from the administrative record of "directives, minutes from meetings or other documentation" that might indicate that Mr. Arikan, "given his various positions, directly or indirectly controlled Marsan or Birlik." *See* Pl.'s Brief at 17 (*quoting* Issues & Decision Memorandum at 13); *see also* Pl.'s Reply Brief at 7. According to Marsan, Commerce thereby applied a standard of actual control, in violation of the statute and the Court of Appeals' holding in Crawfish Processors Alliance. *See* Pl.'s Brief at 17-18 (*citing* Crawfish Processors Alliance v. United States, 477 F.3d 1375, 1380-82, 1384 (Fed. Cir. 2007)); 19 U.S.C. § 1677(33); *see also* Pl.'s Brief at 8 (discussing Crawfish Processors Alliance).[18]  But Marsan seeks

---

[18]In Crawfish Processors Alliance, the Federal Circuit reversed Commerce's affiliation determination based on a finding that the agency had imposed requirements to demonstrate affiliation that were more stringent than those required by statute. *See generally* Crawfish Processors Alliance, 477 F.3d at 1380-82); *see also* Pl.'s Brief at 4, 8, 18 (discussing Crawfish Processors Alliance); Def.'s Brief at 14 (same); Def.-Ints.' Brief at 14-15 (same); Pl.'s Reply Brief at 6-7 (same).

to make much too much of this isolated passage from Commerce's determination.

Throughout the Issues & Decision Memorandum, Commerce repeatedly reiterates the correct legal standard – that is, that the statutory standard for control requires only that an entity be "in a position" to control (*i.e.*, have the ability to control) another entity. *See, e.g.*, Issues & Decision Memorandum at 4, 12, 13; 19 U.S.C. § 1677(33); *see also* Preliminary Results, 76 Fed. Reg. at 23,976 (stating that Commerce "does not require evidence of actual control," and instead "focus[es] upon one party's ability to control the other"). It is thus clear beyond cavil that the agency knew and appreciated the proper standard under the statute. Even more to the point, Marsan reads the language on which it relies entirely out of context. Marsan's argument would have traction only if Commerce's affiliation analysis began and ended with its observation concerning the referenced documentation. But that is plainly not the case here.

In short, Commerce here correctly interpreted and applied the statute, as a matter of law, to require only proof that a third party (*i.e.*, the Ülker group) was in a position to control both Marsan and Birlik/Bellini. However, Commerce ultimately concluded, as a matter of fact, that the record evidence does not support Marsan's claims. *See* Def.'s Brief at 7, 14-15; Def.-Ints.' Brief at 14-15; *see generally* Issues & Decision Memorandum at 13 (stating that Commerce "[did] not find anything in the record that indicates that . . . Marsan [is] in a position to be controlled, either legally or operationally, by . . . a third party"). Marsan's assertion that Commerce improperly applied a standard of "actual control" therefore must be rejected.

## 2.  Unilateral Control

Marsan similarly maintains that Commerce improperly required Marsan to demonstrate that it was subject to "unilateral control" by Mr. Arikan.  *See* Pl.'s Brief at 18-19, 20; Pl.'s Reply Brief at 6, 11.  In particular, Marsan highlights Commerce's conclusion in the Issues & Decision Memorandum that the events surrounding Marsan's conversion from a pasta producing company to a pasta trading company do not "demonstrate *unilateral control* by Mr. Tevfiv Arikan . . . or control by the Ülker [g]roup."  *See* Pl.'s Brief at 19 (emphasis added by Marsan) (*quoting* Issues & Decision Memorandum at 13); *see also* Pl.'s Brief at 18-19, 20; Pl.'s Reply Brief at 6, 11.

Citing the agency's determination in Certain Welded Carbon Steel Pipes and Tubes from Thailand, Marsan argues that "Commerce's own precedents envision that a company may be subject to control . . . by more than one party."  *See* Pl.'s Brief at 19 (*citing* Certain Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review, 62 Fed. Reg. 53,808, 53,810 (Oct. 16, 1997)); *see also* Pl.'s Brief at 20 (same).  As the Government observes, the principle that Marsan invokes "is not necessarily in dispute."  Def.'s Brief at 15.  However, as the Government further explains, the administrative determination that Marsan relies on is inapposite in this case:

> To the extent that Certain Welded Carbon Steel Pipes and Tubes is relevant, it serves as a clearly distinguishable example in which record evidence demonstrated that a respondent company was under common control with certain home market customers by various family relationships. . . . [T]here are no facts here linking Marsan and Birlik in a similar fashion.

Def.'s Brief at 15 (*citing* Issues & Decision Memorandum at 15).

The bottom line is that Marsan simply misinterprets Commerce's (admittedly inept) use of

the term "unilateral control" in the quoted excerpt from the Issues & Decision Memorandum.

Contrary to Marsan's claims, Commerce here did not actually require evidence that the Ülker group

exercised unilateral control over Marsan.  Nor did Commerce require evidence that Mr. Arikan

exercised unilateral control over Marsan.  *See* Issues & Decision Memorandum at 13.  In essence,

in the language at issue, the agency merely reasoned, as a matter of fundamental logic, that – absent

evidence that Mr. Arikan had the ability himself (alone) to control the transfer of Marsan's pasta-

producing assets – it cannot be assumed that the transfer of those assets is indicative of a third party's

control over Marsan (*i.e.*, the Ülker group).  *See* Issues & Decision Memorandum at 13.

As such, Commerce did not, as a matter of law, require any sort of showing of "unilateral

control" in this case.  Instead, Commerce ultimately concluded, as a matter of fact, that the record

evidence did not support Marsan's claim that the transfer of Marsan's pasta-producing assets proved

affiliation.  Marsan's assertion that Commerce improperly required Marsan to demonstrate that it

was subject to "unilateral control" is therefore devoid of merit.

### 3.  Cross-Ownership

Marsan further contends that Commerce improperly interpreted the statute to require that

Marsan demonstrate the existence of "cross-ownership that 'controls' or has the ability to control

Marsan."  *See* Pl.'s Brief at 21 (*quoting* Issues & Decision Memorandum at 13); *see also* Pl.'s Brief

at 16-17 (arguing that statute "does not require direct cross-ownership, nor does it require common

shareholders; its requirement is that two or more companies be controlled by the same third party"),

21 (faulting Commerce for requiring "a cross-ownership that controls" in violation of the statute),

24 (disputing "Commerce's conclusion that Marsan and Birlik/Bellini are not affiliated because they

do not own shares in each other" as "legally wrong" because "it relies on an erroneous legal test")[19];

Pl.'s Reply Brief at 8 (same).

Marsan argues that "[c]ontrary to Commerce's formulation, . . . [19 U.S.C. § 1677(33)(F)]

does not require a 'cross-ownership that controls . . . ' another company.  Rather, the subsection

requires examination of whether, by reason of corporate groupings or otherwise, one entity is in a

position legally or operationally to exercise restraint or direction over each of two or more other

entities."  Pl.'s Brief at 21.  If so, Marsan argues, "then the two controlled entities are affiliated with

each other."  Pl.'s Brief at 21.

At first blush, Marsan appears to fault Commerce for considering the extent of cross-

ownership among the entities at issue.  However, in its administrative case brief, Marsan emphasized

the existence of cross-ownerships and common directors and officers between Marsan and the Ülker

group.  *See*, *e.g.*, Case Brief at 4 (asserting that "[t]he Topbaş family and the Ülker group have

extensive cross-ownerships; common directors, officers, and employees"), 9-19 (summarizing the

cross-ownerships and common shareholders, directors, and officers); *see also* Def.-Ints.' Brief at 5

(noting that "Marsan contended that it was affiliated with Birlik and Bellini by virtue of cross-

ownership and common directors and officers").

---

[19] Read in context, Marsan's claim that Commerce's conclusion that Marsan and Birlik/Bellini do not own shares in each other is "legally wrong" and "factually wrong" (a claim which appears only in the "Conclusion" section of Marsan's principal brief) is nothing more than a claim that Commerce's Issues & Decision Memorandum improperly focused on whether or not Marsan and Birlik/Bellini owned shares in each other (rather than properly analyzing affiliation under the two theories that Marsan pursues in this action).  *See* Pl.'s Brief at 21.  Nowhere in the briefs that Marsan has filed in this forum does Marsan claim that Marsan and Birlik/Bellini owned shares in one another, or that Commerce should have found "affiliation" based on that theory.

The fundamental thrust of Marsan's complaint seems to be a suggestion that Commerce limited its analysis of control to cross-ownership, and failed to evaluate other means of proving control within the meaning of the statute.  Nothing could be further from the truth.  Commerce also considered, *inter alia*, the existence of a corporate grouping, Mr. Arikan's position on Marsan's board, business dealings between Marsan and the Ülker group companies, and facts related to Marsan's "economic community of interests."  *See*, *e.g.*, Issues & Decision Memorandum at 7 (discussing corporate grouping); *id*. at 13 (addressing Arikan's role on Marsan board); Def.'s Brief at 7, 11-12, 13-14, 16 (discussing agency's analysis of Arikan's role on Marsan board); Def.-Ints.' Brief at 1-2, 9-11, 12, 15-16, 19 (same); Issues & Decision Memorandum at 13-15 (discussing various documented business dealings between Marsan and Ülker group companies); Def.'s Brief at 7, 12, 16 (discussing agency's analysis of Marsan-Ülker group business dealings); Def.-Ints.' Brief at 18-19 (same); Issues & Decision Memorandum at 8 (considering "economic community of interests"); Def.'s Brief at 11, 13, 14 (discussing agency's analysis of "economic community of interests" and facts related thereto); Def.-Ints.' Brief at 2, 6, 7, 8, 16-19 (same).

Accordingly, there can be no claim that Commerce in this case confined its analysis of control to evidence of cross-ownership.  Marsan's argument to that effect cannot be sustained.

D.  Verification

Marsan's final argument is that Commerce erred by not conducting an on-site verification of Marsan's questionnaire responses.  *See* Pl.'s Brief at 22-23; Pl.'s Reply Brief at 9 n.4.  Marsan speculates that Commerce decided against such a verification because the agency did not want to risk obtaining "better information" in support of Marsan's claims of affiliation and a "more complete

understanding" of the "pivotal role of Tevfik Arikan" and his alleged "role as Ülker's representative

on Marsan's board." *See* Pl.'s Brief at 23.

Marsan initially took the position that the absence of an on-site verification was "in

contravention of the statute" and constituted a failure by Commerce to fulfill "its statutory

responsibility to conduct a full and complete administrative review." *See* Pl.'s Brief at 22-23. At

oral argument, however, Marsan was quick to back-pedal on that bold charge. Specifically, counsel

for Marsan stated that Marsan "concede[s] that the Government [was] not compelled to do a

verification in this case." Recording of Oral Argument at 56:26-56:36. Marsan's counsel further

acknowledged that an on-site verification was not something "mandatory that [Commerce] had to

do," and that the agency "did not break the law." Recording of Oral Argument at 1:00:19-1:00:32.

Although Marsan did not expressly state that it was abandoning its verification argument, its position

seems clear enough from the record.

Even if Marsan did not intend to abandon its verification claim, the doctrine of exhaustion

of administrative remedies would bar Marsan from pressing the argument. *See generally* Def.'s

Brief at 16-18. As a general matter, the doctrine of exhaustion holds that "no one is entitled to

judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been

exhausted." <u>Sandvik Steel Co. v. United States</u>, 164 F.3d 596, 599 (Fed. Cir. 1998) (*quoting* <u>McKart</u>

<u>v. United States</u>, 395 U.S. 185, 193 (1969)) (internal quotation marks omitted). Thus, it is a well-

settled principle of administrative law that "[a] reviewing court usurps the agency's function when

it sets aside [an agency] determination upon a ground not theretofore presented and deprives the

[agency] of an opportunity to consider the matter, make its ruling, and state the reasons for its

action." Unemployment Compensation Comm'n of Alaska v. Aragon, 329 U.S. 143, 155 (1946);

see, e.g., Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1191 (Fed. Cir. 1990).

As the Government notes, Commerce's regulations require that a party's administrative case

brief "present all arguments . . . relevant to the Secretary's final determination or final results,

including any arguments presented before the date of publication of the preliminary determination

or preliminary results." See Def.'s Brief at 17 (quoting 19 C.F.R. § 351.309(c)(2)). "If a party does

not exhaust available administrative remedies, 'judicial review of [Commerce's actions] is

inappropriate.'" Consol. Bearings Co. v. United States, 348 F.3d 997, 1003 (Fed. Cir. 2003)

(quoting Sharp Corp. v. United States, 837 F.2d 1058, 1062 (Fed. Cir. 1988)). "'[T]he [Court of

International Trade] generally takes a "strict view" of the requirement that parties exhaust their

administrative remedies.'" Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370,

1381 (Fed. Cir. 2013) (quoting Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir.

2007) (citations omitted)).

Requiring exhaustion even in a discretionary, non-jurisdictional context is generally sound

policy, because it allows the agency to apply its expertise, to correct its own mistakes, and to compile

an adequate record to support judicial review, advancing the dual purposes of protecting agency

authority and promoting judicial efficiency. See Woodford v. Ngo, 548 U.S. 81, 89 (2006)

(discussing two main purposes of doctrine of exhaustion, i.e., protecting "administrative agency

authority" and promoting judicial economy); Richey v. United States, 322 F.3d 1317, 1326 (Fed. Cir.

2003) (same). Accordingly, in actions challenging determinations in antidumping administrative

reviews, the Court of International Trade requires litigants to exhaust administrative remedies

"where appropriate."  28 U.S.C. § 2637(d); *see also* <u>Corus Staal</u>, 502 F.3d at 1379 (stating that 28

U.S.C. § 2637(d) "indicates a congressional intent that, absent a strong contrary reason," court

should require exhaustion of administrative remedies); <u>McCarthy v. Madigan</u>, 503 U.S. 140, 144

(1992) (explaining that, even "where Congress has not clearly required exhaustion, sound judicial

discretion governs").

Here, Marsan implicitly concedes (as it must) that it never once proposed that Commerce

conduct on-site verification as part of this review.  *See* Pl.'s Brief at 23 (noting that only "petitioners

[*i.e.*, the Domestic Producers] requested verification").  Instead, Marsan relies on the fact that

verification was requested by the Domestic Producers.  *See* Pl.'s Brief at 23.  As the Government

points out, however, the Domestic Producers' request was limited to verification of Marsan's "sales

and cost data."  *See* Def.'s Brief at 17 n.4 (*citing* Domestic Producers' Verification Submission

(CRU Pub. Doc. No. 21)).  More importantly, neither Marsan nor the Domestic Producers preserved

any arguments concerning on-site verification by raising the issue in their administrative case briefs.

Because Marsan did not include its argument concerning on-site verification in its

administrative case brief, Commerce was not put on timely notice of Marsan's claim.  Marsan is

therefore precluded from raising the issue for the first time in this action.  *See* Def.'s Brief at 18.[20]

---

[20]There are a limited number of narrow exceptions to the requirement that a party exhaust its
administrative remedies.  *See, e.g.*, 5 J. Stein, G. Mitchell, & B. Mezines, *Administrative Law* §
49.02, at 49-47 (2012) (summarizing exceptions to requirement of exhaustion, including inadequacy
of administrative remedy, impending irreparable harm, *ultra vires* agency action, futility, and pure
legal question); *see also* 2 R. Pierce, *Administrative Law Treatise* §§ 15.2-15.8, 15.10 (5th ed. 2010)
(summarizing doctrine of exhaustion and discussing exceptions); 4 C. Koch, *Administrative Law and
Practice* § 12:22 (3d ed. 2010) (discussing exceptions); <u>SeAH Steel Corp. v. United States</u>, 35 CIT
____, ____, 764 F. Supp. 2d 1322, 1325-26 (2011) (summarizing exceptions); <u>Corus Staal BV v.
United States</u>, 30 CIT 1040, 1050 n.11 (2006), *aff'd* 502 F.3d 1370 (Fed. Cir. 2007) (same); <u>Ta Chen</u>

Marsan's failure to timely assert its verification argument at the administrative level means that it cannot now be heard to criticize Commerce for failing to undertake such a verification.  By its silence, Marsan waived its right to press that issue in this forum.  *See* <u>AIMCOR v. United States</u>, 141 F.3d 1098, 1111-12 (Fed. Cir. 1998).

In any event, contrary to Marsan's implication, on-site verification would not have accorded Marsan the opportunity that it contemplates – that is, the ability to further supplement the record with "better information on affiliation" and other additional evidence favorable to its case.  *Compare* Pl.'s Brief at 23 *with* Def.-Ints.' Brief at 21.  As the Domestic Producers correctly point out, "[t]he purpose of verification is not to collect new information, and Commerce warns respondents in its verification agenda that verification will not provide the opportunity to submit new factual information."  *See* Def.-Ints.' Brief at 21.

Like all of its other arguments, Marsan's argument concerning on-site verification is also unavailing.

---

<u>Stainless Steel Pipe, Ltd. v. United States</u>, 28 CIT 627, 645 n.18, 342 F. Supp. 2d 1191,1206 n.18 (2004) (same).

However, Marsan has not sought to claim the benefit of any of the established exceptions. Nor do the facts suggest that Marsan could successfully do so.

### IV.  <u>Conclusion</u>

For the reasons set forth above, Marsan's Motion for Judgment on the Agency Record must

be denied, and Commerce's Final Results of the 14th Antidumping Duty Administrative Review of

Certain Pasta from Turkey, 76 Fed. Reg. 68,399 (Nov. 4, 2011), are sustained.

Judgment will enter accordingly.


                                                <u>    /s/ Delissa A. Ridgway    </u>
                                                    Delissa A. Ridgway
                                 Judge

Decided:  July 19, 2013
                 New York, New York